NORA M. CARRUTHERS, *as Administratrix of the Estate of John T. Carruthers, deceased*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.

DEFECTIVE APPLIANCE—*Company's Knowledge of Defect—Injury to Employee.* In an action against a railway company to recover damages for the death of an employee, resulting from personal injuries, where the negligence alleged is the furnishing of a defective appliance in the use of which the employee was injured, it is necessary to allege and prove, among other things, that the defendant knew of the defect, or that it was of such a nature or had existed for such a length of time that, in the exercise of ordinary care, it should have been discovered by the defendant, in which case notice ought to be presumed; and where there is no evidence of such notice or its equivalent, a demurrer to the evidence is properly sustained.

*Error from Brown District Court.*

ACTION by *Nora M. Carruthers*, as administratrix of the estate of John T. Carruthers, deceased, against *The Chicago, Rock Island & Pacific Railway Company* to recover damages on account of the alleged negligence of said railway company, resulting in the death of plaintiff's intestate. The court below sustained a demurrer interposed by the defendant to the plaintiff's

evidence, and entered judgment against the plaintiff
for costs. The plaintiff brings the case here. The
material facts are stated in the opinion herein, filed
July 6, 1895.

*Grant W. Harrington, F. M. Webb,* and *A. F. Martin,*
for plaintiff in error.

*M. A. Low,* and *W. F. Evans,* for defendant in error.

The opinion of the court was delivered by

MARTIN, C. J.: The only question argued in this
case is whether the court erred or not in sustaining
the demurrer of the defendant to the evidence intro-
duced on the part of the plaintiff. That evidence
shows that on or about January 10, 1889, John T.
Carruthers was a freight-conductor in the service of
the defendant company; that he started from Horton
southward with a train of about 35 cars bound for
Herington via North Topeka and Topeka; that his
train stopped at the roundhouse in North Topeka, and
also at the registering station some distance north of
the railroad bridge spanning the Kaw river; that as
the train started from there, between 1 and 2 o'clock
in the morning, he got on somewhere in front of the
caboose and then walked a distance forward on the
tops of the cars; that, before the train got across to
the south end of the bridge, he uttered a cry of dis-
tress, which was heard by a brakeman named Foley,
in the cupola of the caboose, and who, getting down
quickly, and looking out, saw that the wheels of the
caboose were passing over a man, afterward ascertained
to be the conductor; that the train was stopped, and
he was found lying across the west or right-hand rail,
his head outward and the lower part of his body and
limbs between the rails, with the appearance of hav-

ing been run over by several cars; that he was badly crushed about the hips, and died from his injuries in about an hour. It further appears that in the train were two flat cars loaded with telegraph-poles, and next behind them and about the ninth car ahead of the caboose, a Missouri Pacific car of unusual height, being about two feet above the other box cars in the train, and called in the evidence a "hay-car," which was coupled to the flat car next ahead of it with a long crooked link; that a short time after the injury, the train having been backed to North Topeka, another freight-conductor named Sylvester climbed upon the top of said hay-car for the purpose of giving a signal, and, when he descended at the south end on the west side he found that the iron rod on the top of the car used for a hand-hold in going up or down the ladder on the side was loose and projecting outward at the south end, the screw fastening that end of the iron rod to the wooden roof of the car not being in its place either in the wood or the iron. Sylvester further testified that he noticed on the flange of the front wheel of the south end of the west side of the hay-car a clot of blood, and a little piece of flesh about the size of the end of his thumb, and a little fuzz or piece of woolen cloth corresponding with the material in the coat and vest worn by Carruthers at the time. The tops of the cars were frosty and slippery that night. Three or four car-inspectors are employed by the defendant at Horton, whose business it is to examine all cars going out to see if they are in good and safe condition, and as many more are kept at Topeka—with duties on both sides of the river—but there is no evidence, unless this be such, whether the car was examined or not at Horton or North Topeka. It was usual for freight-

conductors, on leaving the North Topeka registering station, to go forward on the tops of the cars while crossing the bridge so they might get off and register at the Y on the south side of the river, and get on again, and thus avoid stopping the train entirely on a considerable curve. Nora M. Carruthers, the widow of said John T. Carruthers, was duly appointed as administratrix of his estate, and, having qualified, she sues in that capacity. The deceased left also a daughter surviving him.

The plaintiff's theory of the disaster is that, when the ill-fated conductor reached the south or front end of the hay-car, he could not get to the flat next ahead, loaded with telegraph-poles, without descending to the level of the platform; that, in doing so, he caught hold of the iron rod which was loose or defectively fastened and out of repair at its south end; that it gave way, and, by reason thereof, he fell and was run over. The blood, the small piece of flesh and the fuzz on the flange of the wheel near the ladder are relied on as sufficiently indicating that the primary cause of the injury was the defective hand-hold. The position in which the conductor was afterward found and the nature of his injuries would render it more probable that he fell not only between the cars, but between the rails, for he was caught on the west rail nearly midway of his body. As it is a matter of common knowledge that freight-cars extend out considerably beyond the rails, it would seem that he would not be likely to get under the wheels in falling from the side of this high car by the giving way of the hand-hold on its top, and therefore that this defect had no relation to the injury.

In *Asbach v. C. B. & Q. Rly. Co.*, 74 Iowa, 248, the court held that a theory cannot be said to be estab-

lished by circumstantial evidence, even in a civil case, unless the facts relied upon are of such a nature and are so related to each other that it is the only conclusion that can reasonably be drawn from them, and that it is not sufficient that they be consistent merely with that theory.    In the case now under consideration the blood, flesh and fuzz on the flange of the front wheel of the hay-car may indicate that the conductor was first struck by that wheel; but it is at least as probable that he fell between the hay-car and the flat and between the rails, as that he was precipitated from the side of the car by the giving way of the hand-hold. Still, it may be that these theories and others suggested by counsel ought to have been submitted to the consideration of the jury, if no other serious objection had become apparent.

In the amended petition it is averred that the defendant knew, or by the exercise of ordinary care ought to have known, that said hand-hold on the hay-car was loose, unfastened, unsafe, insecure and dangerous, and that it was negligence to admit the car into the train or to permit it to remain after it had been taken in; and an averment of this nature is essential as a basis of recovery in this class of cases, as settled by repeated decisions of this court, supported by the general current of authority.   A careful examination of the record fails, however, to disclose any evidence tending to justify this allegation of negligence against the defendant, unless it be the mere fact that the hand-hold was found to be out of repair a short time after the injury.   If the conductor attempted to descend by its aid it is most probable that it was then in place and seemingly safe, otherwise he would have been negligent in using it.   The screw may have suddenly pulled out of the wood by reason of slight decay around

it and under the end of the fastening of the iron rod.
But this is speculation only. It does not appear where
the car came upon the defendant's road beyond Hor-
ton, and we have no account of it further than North
Topeka and the bridge. If it had been shown that
the rod was loose, or out of order, or the wood so de-
cayed at the place of fastening as to render it unsafe,
and this was discoverable by ordinary inspection at
Horton or at the North Topeka roundhouse, then it
would be a matter for the jury to determine whether
the defect was known, or by the exercise of ordinary
care ought to have been known, by the defendant in
time to remedy or call attention of em-
ployees to it before the occurrence of the
casualty. But in the absence of any such
proof the district court was right in sus-
taining a demurrer to the evidence. The
law is settled by *A. T. & S. F. Rld. Co. v. Wagner*, 33
Kas. 660 ; *A. T. & S. F. Rld. Co. v. Ledbetter*, 34 id.
326 ; *Harter v. A. T. & S. F. Rld. Co.*, ante, p. 250, and
the numerous cases there cited ; same case, 38 Pac.
Rep. 778.

*Defective appliance — company's knowledge of defect — injury to employee.*

. The case of *Guthrie v. Maine Cent. Rld. Co.*, 18 Atl.
Rep. (Me.) 295, is cited by counsel for the plaintiff as
tending to establish the proposition that if a car with
defective appliances is taken into a train, and an injury
to an employee results from it, the company will be
liable without proof of notice of the defect or its equiv-
alent. But we do not think that case will bear such
a construction, for there the draw-bar and bumpers of
the car which was the instrument of the injury had
been broken off before the casualty complained of, and
this was a patent defect of which the railroad company
was bound to take notice.

We are also referred to *C. & E. I. Rld. Co. v. Kneirim*,

39 N. E. Rep. 324, decided by the supreme court of Illinois. But in that case it appeared that, although the car had just been inspected, "the nut which held the wheel on the brake-staff was off, and, from the rusted appearance of the threads of the staff — they being filled with rust — had been off for several weeks," and the absence of the nut was the cause of the injury.

The judgment of the district court must be affirmed.

All the Justices concurring.